REL:09/30/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1130214

_____

**Yanmar America Corporation**

v.

**Randy Nichols**

**Appeal from Marion Circuit Court**
**(CV-09-900054)**

BOLIN, Justice.

Yanmar America Corporation ("Yanmar America") appeals from a judgment entered in favor of Randy Nichols following a trial by a jury of his claims alleging a negligent failure to warn. We reverse and remand.

<u>Facts and Procedural History</u>

<u>I. The Accident</u>

In May 2005, Autrey Nichols purchased a Yanmar model 2210BD tractor from Northside Motors, LLC ("Northside"), in Hamilton. The Yanmar tractor came equipped with a front-end loader and a "bush hog" attachment.[1] The Yanmar tractor did not have a rollover-protection structure ("ROPS"). On May 1, 2008, Randy Nichols, the plaintiff and Autrey's brother, used the Yanmar tractor to bush hog a neighbor's property. The particular area of the property Randy was to bush hog was a field that contained a hill, the slope of which increased as he moved toward the center of the field. Randy did not "walk" the field to inspect the terrain before bush hogging the field. Randy testified that he was operating the tractor in tall grass at "walking speed" when he glanced back at the bush hog to make sure it was operating properly. Randy stated that when he looked forward it appeared that the right front tire suddenly "took a dip," causing the tractor to roll over. The

---

[1]"'Bush Hog' is the trade name of a large mower generally drawn by a tractor. The term 'bush hog' is often used generally for such mowers and as a verb indicating the use of such mowers." <u>Ammons v. Massey-Ferguson, Inc.</u>, 663 So. 2d 961, 963 (Ala. 1995).

1130214

right front tire of the tractor encountered a slight "drop off" on the side of the hill, which caused the tractor to roll over 360 degrees and come to a rest upright on its tires. Randy was thrown from the tractor. He stated that he remembered the bush hog "coming over on me" and that he tried to roll out of the way but was unable to do so. Randy testified that he threw his arm up to protect his head and felt excruciating pain. Randy suffered severe injuries, including an amputated right arm, a crushed hip and leg, and various other injuries. Before the accident, Randy had more than 30 years' experience operating tractors and other heavy equipment. Randy had operated the subject Yanmar tractor approximately 15 to 20 times without incident before the accident. Randy testified that he had experience operating tractors with implements such as front-end loaders, backhoes, bush hogs, "graderplates," "breaking plows," and "planters." Randy testified that he had operated tractors both with and without the ROPS and that he was comfortable operating a tractor that was not equipped with the ROPS. Randy stated that he knew that any tractor had the potential to roll over and that, if a tractor that was not equipped with a ROPS

3

rolled over, the driver could be seriously injured or killed. He further testified that he knew how to operate a tractor, that he was a "safe" tractor operator, and that he had never rolled a tractor over before the accident in this case.

## II. The Gray-Market[2] Tractor and Factors Contributing to the Rollover

The subject Yanmar tractor was manufactured on March 5, 1979, by Yanmar Diesel Engine Co., Ltd. ("Yanmar Japan"),[3] at its Kinomoto plant in Japan. At the time of its manufacture, the tractor was equipped with a rotary tiller. The tractor was sold on March 29, 1979, to Kounomiya Yanmar, an authorized Yanmar dealer in Japan. The Yanmar tractor was "purpose built" for primary use in the rice paddies of Japan. The tractor was designed and manufactured in accordance with Japanese industry and governmental standards in existence at

---

[2]"Gray market" has been defined as a "'market in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell (esp. imported goods) at prices lower than those envisioned by the manufacturer.'" Rife v. Hitachi Constr. Mach. Co., 363 S.C. 209, 217, 609 S.E.2d 565, 570 (S.C. Ct. App. 2005) (quoting Black's Law Dictionary 989 (8th ed. 2004)). "Gray-market" products include products that have been produced abroad with authorization and payment and have been imported into unauthorized markets. Id.

[3]Yanmar Japan subsequently changed its name to Yanmar Co., Ltd.

1130214

the time. The original operator's manual for the tractor printed by Yanmar Japan and the warning labels affixed to the tractor were all written in Japanese.

Before 1991, Yanmar Japan had manufactured Yanmar brand tractors specifically for distribution in the United States. Subsequent to its entry into the United States market in the late 1970s, Yanmar Japan established Yanmar America in 1981. Yanmar America is a wholly owned subsidiary of Yanmar Japan; one of its functions is to distribute parts for Yanmar tractors authorized for sale in the United States. In 1991, Yanmar Japan ceased manufacturing and distributing Yanmar tractors for sale in the United States market.

Significant design differences existed between those Yanmar brand tractors manufactured for use in the Japanese market and those Yanmar brand tractors manufactured for use in the United States market. The tractors manufactured for the Japanese market: (1) had relatively slow travel speed, which was conducive to rice-paddy tilling; (2) had much higher "lugs" on the tractor tires, which were specially suited for use in muddy rice paddies; (3) had a standard rotary-tiller attachment suitable for tilling rice paddies rather than a

front-end loader or a bush hog; and (4) had a four-speed "power take-off" to accommodate the varying tiller speeds required in rice-paddy tilling. The operator's manuals and warning decals for those tractors were printed in Japanese. Because of the significant differences in the design and performance of the tractors, the tractors intended for the Japanese market were never intended to be sold or used in the United States market.

Dennis Skogen, Yanmar America's engineering and accident-reconstruction expert witness, testified that the factors contributing to the rollover here included operating the tractor on the side slope; encountering the "drop off" on the side slope; and the configuration of the tractor, which included operating the tractor with the front-end loader in the raised position, a lack of ballast in the tires, and the bush hog on the back. Skogen testified that ballast in the tires would have decreased the likelihood of a rollover because it would have lowered the center of gravity of the tractor. Skogen also stated that operating the tractor with the front-end loader in the lowered position would also lower the center of gravity. Skogen also testified that a properly

6

attached ROPS would have "more likely as not" prevented the tractor from rolling past 90 degrees, but, given the slope of the hill on which the rollover occurred, it was possible that the ROPS would not have prevented the tractor from rolling past 90 degrees. However, Skogen also stated that the tractor was not unreasonably dangerous because it was not equipped with a ROPS. Rather, Skogen testified that the tractor should not have been imported and sold in the United States in the first place because it was designed and manufactured for use in the rice paddies of Japan, and not for use in the United States equipped with a front-end loader and a bush hog. Skogen testified as follows:

"Q. Well, what ... made a difference, in your opinion, about this tractor rolling over and this injury to Randy ... occurring?

"A. Well, we talked about that before. It's the slope. It's the drop-off itself. We're talking about what the tractor is, what the tractor -- its configuration. It has tires on it, as an example, for use in rice paddies. It's not the type of tire that would we would normally see for use on other tractors in a similar situation .... [T]his tractor shouldn't have been imported in the first place, so there wouldn't have been a rollover with this tractor in the second place with or without a ROPS.

"Q. Okay. What differences that existed in this tractor that you have listed, as you say it was

designed for use in Japan, made a difference in causing this rollover or the injuries to Randy?

"A. Well, start off with a tiller on the back. Now, if you're going to bring the tractor into this country, it would have a tiller on the back. It wouldn't have a mower on the back. You wouldn't be using it for ... mowing. It's used for tilling rice paddies. You wouldn't have a front-end loader because, again, the purpose is to have a tiller on the back. The tiller would be lower in its configuration. It wouldn't have been used in this field in the first place because this is not a rice paddy.

"Q. All right. What else?

"A. Again, I talked about before about the configuration with the tires. They have higher tread on them, which can in a sense raise the center of gravity versus a tractor that has turf tires or tires that don't have the rice paddy type tires.

"Q. And other than the fact that the tractor wouldn't be here, you know, if they hadn't imported it for use in the United States, I want to know specifically anything besides the tiller and the fact it wouldn't have a front-end loader, in your opinion, that are the features you say were made for Japan that you think were specifically causative in contributing to this rollover?

"A. It's the configuration of the entire piece of equipment. It's the fact that it had a mower on the back and not the tiller. Again, it's a tiller. The tractor used in Japan didn't have a front-end loader. Now we come to the configuration of the tractor, the size of the tractor, the width of the tractor, the length of the tractor, the weight of the tractor. It's the tractor that rolls over. You can't say that there's one part of the tractor that caused it to roll over in the absence of another

part. It's the configuration of the tractor given this slope, which, again, I talked about before is steep, and then given the drop-off or ledge as I described it before."

Dr. Thomas Carpenter, an agricultural engineer and safety expert, testified that the primary cause of the rollover was the lack of stability of the tractor, caused by its narrow wheel spacing, and the front-end loader being attached to the tractor. Dr. Carpenter stated that the Yanmar tractor in question had a tipping angle of 37.4 degrees and a tread width of 40 inches, whereas similarly sized American-made tractors manufactured in the same year as the Yanmar tractor at issue had tipping angles in excess of 45 degrees and tread widths that varied between 51 inches and 75 inches. Dr. Carpenter opined that the relative instability of the Yanmar tractor based on tread width and tipping angle, when compared to the similarly sized American-made tractors, "resulted in it overturning" under the conditions in which it was being used on the day of Randy's accident. Dr. Carpenter further testified that the addition of the front-end loader "definitely increased the instability" of the tractor by moving the center of gravity of the tractor higher and forward. Dr. Carpenter stated that, based on what he knew of

9

this tractor's stability characteristics, he would not have used it to bush hog the property Randy was bush hogging. Dr. Carpenter testified that a ROPS would likely have prevented the tractor from rolling more than 90 degrees but that, even if the tractor had been equipped with a ROPS, he would not have used it to bush hog the property.

### III. The Purchase of the Gray-Market Tractor

Arnold Trimm owned Artec Tractor and Equipment, Inc. ("Artec"), from 1994 until 2006. In the late 1990s Trimm saw an advertisement in a magazine for used Japanese farm tractors. Trimm contacted the suppliers of the tractors and eventually traveled to Japan to meet with the suppliers. Trimm testified that he was told by the suppliers that the tractors were "good used farm tractors." Trimm stated that he was not told that the tractors had been specifically designed and manufactured for use in Japan and not for use in the United States. Trimm testified that Artec imported and sold the used Japanese farm tractors from 1998 until 2005. Artec sold parts for the used "gray-market" Yanmar tractors it

1130214

imported. Artec became an authorized Yanmar America dealer in July 2005.[4]

In 2005, some 26 years after the subject Yanmar tractor Randy was operating was manufactured and first sold primarily for use in the rice paddies of Japan, Artec purchased the tractor from a gray-market supplier and imported the tractor into the United States. On April 28, 2005, Artec sold the Yanmar tractor to Northside, which, in turn, sold the tractor to Autrey Nichols.

After purchasing the tractor, Autrey purchased an English-language version of the operator's manual for the tractor. The operator's manual explained that the Yanmar model 2210BD tractor was a gray-market tractor that was originally manufactured for sale in Japan and that was subsequently purchased used by a dealer or broker and imported into the United States. The manual explained certain differences between the gray-market tractors and the Yanmar brand tractors manufactured for use in the United States,

---

[4]The 2005 dealer agreement appointed Artec as an authorized dealer of certain Yanmar brand excavators, wheel loaders, crawler carriers, and compact back-hoe loaders. Artec did not become an authorized dealer of Yanmar tractors because Yanmar had ceased distributing Yanmar tractors to the United States market in 1991.

11

including the fact that Japan does not require its tractors to be equipped with a ROPS, although the tractors manufactured for use in the United States are required to be equipped with a ROPS. The manual also contained information and warnings on the risk of rollovers, particularly while operating the tractor on slopes; stability issues and the need for ballasts when operating the tractor with a front-end loader; the importance of a ROPS; and the need to inspect unfamiliar terrain before operating the tractor. Autrey did not provide Randy with the manual and did not discuss with him any information contained in the manual. Additionally, the front-end loader and bush hog attachment that accompanied the Yanmar tractor when it was purchased also came with operator manuals, and each was affixed with warning decals. Those warning decals were printed in English and warned of the possibility of rollover and recommended using a ROPS at all times.

When asked whether he usually read all warning labels before operating a tractor or other equipment, Randy stated that he "probably glanced at them, but ... felt like [he] was a safe operator, and [he] just overlooked them." Randy testified that he did not need a warning with regard to the

1130214

Yanmar tractor in this case. He stated that when he glanced at the labels on the tractor he was not concerned that the labels were in Japanese. Randy never saw the operator's manual for the tractor, the front-end loader, or the bush hog. He testified that he did not need to read an operator's manual to know how to operate a tractor and the attached front-end loader and bush hog. He stated that reading the operator's manuals for either piece of equipment did not interest him because he had become so familiar with operating heavy equipment that he did not need to read the manuals in order to know how to operate the tractor with the attachments.

IV. Yanmar America's Efforts to Warn Against the Gray-Market Tractors

Ryan Pott, the director of legal affairs for Yanmar America, testified that Yanmar America first discovered in 1990 that gray-market Yanmar tractors were being imported into the United States. Pott testified as to various documents relating to the gray-market tractors. In December 1991, Gary Bilek, an employee of Yanmar America, notified Yanmar Japan by letter of certain "problems" Yanmar America was having with the gray-market tractors, specifically noting that the purchasers of the gray-market tractors were being told that

13

1130214

they could purchase parts for the tractors from Yanmar America. Bilek stated in his letter that "we've been instructed not to help these customers procure spare parts because they come into the United States without any rollover protection." Bilek then asked "can anything be done in Japan to stop the unauthorized sale of these units?"

In 1992, Yanmar America began disseminating in various trade publications safety notices concerning the safety issues associated with the gray-market tractors. On July 24, 1992, Yanmar Tractor Service U.S.A., Inc.,[5] issued a statement to all Yanmar tractor parts and service dealers, informing them that the gray-market tractors were not designed for distribution in the United States, that they were being imported without the approval of Yanmar Japan, and that, therefore, a parts- and service-support network was not available for the gray-market tractors. Yanmar America

---

[5]Yanmar Tractor Service U.S.A., Inc. ("Yanmar Tractor Service"), was a former distributor of authorized Yanmar tractors in the United States. Subsequent to Yanmar Japan's cessation of the distribution of Yanmar tractors to the United States market in 1991, Yanmar Tractor Service became a service and parts provider for Yanmar tractors in the United States. It appears from the record that at some point Yanmar Tractor Service merged with Yanmar America, and Yanmar America became the service and parts provider for Yanmar tractors intended for the United States market.

14

requested that the dealers inform those considering purchasing a gray-market tractor as to the lack of available parts and service support and to inform them that most all the safety decals were printed in Japanese. Yanmar America also noted in this statement that "the long term response to the problems created by Gray Market Tractors will take some time and careful consideration."

In August 1992, Yanmar Japan conducted a "Study Meeting on Policy to Cope with Sales in USA of Used Tractors that were Manufactured for Domestic Market." The purpose of the meeting was to discuss the concerns of Yanmar Japan management regarding potential liability arising from the sales in the United States of the gray-market tractors. It was determined at this meeting that Yanmar Japan would honor the requests for parts for the gray-market tractors while it continued to assess the issue of the gray-market tractors. Pott testified that there was an internal debate within Yanmar Japan at the time as to whether it should support the gray-market tractors with parts and service.

In May 1995, John Sonnentag, a manager in the parts and service department at Yanmar America, reported by internal

memorandum addressed to Koju Saski, a manager with Yanmar Japan, regarding a recent meeting he had attended in Japan in which it had been "indicated [that] all parts are available, regardless of status." Sonnentag also noted in his memorandum that the "above information contradicts the position taken by Gary Bilek's letter." Pott stated that this correspondence indicated that the gray-market tractors would be supported with parts and service.

On January 18, 2000, Yanmar America posted on its Web site an "Important Safety Notice" regarding the gray-market tractors, which was intended for the parts and service dealers, for potential purchasers of gray-market tractors, and for owners of gray-market tractors. The safety notice explained what a gray-market tractor was and also explained the important design and operating differences between a gray-market tractor and those Yanmar tractors specifically manufactured for use in the United States. The safety notice did not contain any specific reference to differences in the stability of gray-market tractors and those tractors manufactured for use in the United States, nor did the notice

1130214

contain a specific warning regarding the use of front-end loaders or bush hogs with the gray-market tractors.

In 2002, Yanmar America implemented a computer parts-blocking program to combat the sale of Yanmar gray-market tractors in the United States. The parts-blocking program was designed to stop the sale of replacement parts for the gray-market tractors. The program required a parts dealer purchasing parts from Yanmar America to specify both the model number and the serial number of the tractor for which the part was being purchased. Yanmar America would be able to discern from a computer database whether the part was being purchased for a gray-market tractor based on the model and serial numbers, and it could then block the sale of that part.

On July 20, 2005, Yanmar America issued another "Important Safety Notice" that was posted to its Web site regarding "Gray Market Tractors, Excavators, Wheel Loaders, and Carriers." This safety notice was substantially similar to the safety notice issued in January 2000, except that this notice included excavators, wheel loaders, and carriers, in addition to the gray-market tractors. The safety notice explained what a gray-market product was and also explained

17

the important design and operating differences between gray-market products and those Yanmar products specifically manufactured for use in the United States. This particular safety notice also explained that, as the result of those safety issues, Yanmar Japan would not support gray-market tractors, excavators, wheel loaders, and carriers with replacement parts. Again, this safety notice did not contain any specific reference to differences in the stability of gray-market tractors and tractors manufactured for use in the United States, nor did the notice contain a specific warning regarding the use of front-end loaders or bush hogs with the gray-market tractors.

Pott testified that Yanmar Japan and Yanmar America became concerned that equipment dealers selling gray-market tractors, owners of gray-market tractors, and potential purchasers of gray-market tractors may not have been aware of the important differences between the gray-market tractors and those Yanmar tractors manufactured and intended for distribution in the United States market. Pott testified that the need for warnings arose out of the way the gray market had developed, as well as Yanmar Japan's decision to support the

gray-market tractors with genuine Yanmar parts during a period of time in the 1990s, which, he stated, created confusion as to whether there were significant differences between the gray-market tractors and those Yanmar tractors intended for use in the United States market. Pott testified that he therefore directed in 2008 that the safety notices be mailed to all authorized Yanmar dealers of parts and service, construction, and industrial equipment. Artec did not receive the safety notice until 2010, two years after the accident that is the basis of this action. Pott explained that the safety notices were not all mailed out at the same time but that they were done over time.

Yanmar America has filed trademark-infringement lawsuits seeking to stop the importation and sale of gray-market tractors through the Internet site "eBay."[6] In January 2004, Yanmar America sent a letter to HDI Tractor, a nonauthorized Yanmar tractor dealer, threatening legal action if HDI Tractor did not cease importing and selling gray-market Yanmar tractors. Yanmar America further demanded that HDI Tractor

---

[6]The Internet site eBay is a consumer-to-consumer online auction and shopping Web site in which individuals and businesses buy and sell a wide variety of goods worldwide.

contact its customers who had purchased gray-market Yanmar tractors and inform them that the tractors were not intended for use in the United States, that they may not be equipped with proper safety features for use in the United States, and that HDI Tractor would refund the full purchase price of the tractor. Yanmar and HDI Tractor eventually entered into a settlement agreement in which HDI Tractor agreed to send copies of the "Important Safety Notice" to its customers that had purchased a gray-market tractor.

In September 2005, Yanmar America sent notices to its authorized parts and service dealers prohibiting those dealers from selling gray-market tractors and from providing parts and service for gray-market tractors. The authorized dealers were required to acknowledge in writing that they would not sell gray-market products, or they risked losing their status as an authorized Yanmar dealer. In several instances authorized parts and service dealers continued to participate in gray-market activity; those dealers' authorized dealer agreements were terminated by Yanmar America. It appears from the record that the notices prohibiting the sale of Yanmar gray-market tractors and the supply of parts and services for the gray-

market tractors were sent only to authorized Yanmar parts and service dealers and not to authorized dealers of Yanmar equipment such as Artec.

As mentioned above, Artec became an authorized dealer of Yanmar equipment in July 2005. Prior to Artec's becoming an authorized equipment dealer in July 2005, Yanmar America did not inquire whether, or confirm that, Artec was selling gray-market tractors and parts. Artec did not receive any notice from Yanmar America regarding gray-market tractors until 2010. Yanmar eventually discovered that Artec had continued to participate in gray-market activity and terminated its dealer agreement in April 2013, approximately three weeks before the start of the trial in this case.

On October 1, 2009, Randy sued Yanmar Japan, Yanmar America, Artec, and Northside, asserting claims under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and a claim alleging breach of an implied warranty. Count I of the complaint alleged that the tractor was unreasonably dangerous because it was designed, manufactured, distributed, and sold without a ROPS. Count II of the complaint alleged the defendants' negligence in designing, manufacturing,

distributing, and selling the tractor without a ROPS as standard equipment. Count III of the complaint alleged that the defendants breached the implied warranty of fitness for a particular purpose in manufacturing, distributing, and selling the tractor without a ROPS as standard equipment.

On November 10, 2011, Yanmar Japan moved the trial court, pursuant to Rule 12(b)(2), Ala. R. Civ. P., to dismiss the complaint against it for lack of in personam jurisdiction. On February 28, 2012, Randy amended his complaint to allege that Yanmar Japan and Yanmar America were:

> "a). Reckless or negligent in manufacturing and selling Yanmar parts which [they] knew were being ordered for use in Yanmar gray market tractors in the United States, for which tractors there would not have been a viable market in the United States without such parts;
>
> "b). Reckless or negligent in issuing warnings that Yanmar gray market tractors could not be retrofitted with ROPS;
>
> "c). Reckless or negligent in performing dealer audits of Artec before and after it became an authorized Yanmar dealer, which audits if done in a reasonable manner would have revealed that Artec was and had been for many years a volume seller of Yanmar gray market tractors, and which would have resulted in gray market tractor warnings being issued to Artec and prohibitions being imposed on Artec against selling Yanmar gray market tractors;

"d). Reckless or negligent in failing to warn their own authorized dealer Artec that Yanmar gray market tractors were not manufactured in a manner which met U.S. safety standards, and were not manufactured for sale in the U.S. as well as in Japan, in the same manner which it undertook to warn other authorized Yanmar dealers in Alabama prior to the sale by Artec of the subject tractor and prior to Randy Nichols'[s] injuries;

"e). Negligent in not instructing their authorized dealer Artec to provide to any purchasers and owners of Yanmar gray market tractors which Artec had sold Yanmar's 'Important Safety Notice,' and in not instructing Artec to advise such purchasers and owners that suitable ROPS were available for retrofit on their Yanmar tractors and that such tractors were not reasonably safe for operation unless ROPS were installed on the tractors.

"f). Negligent in not prohibiting their authorized dealers in Alabama from selling Yanmar gray market tractors, while undertaking to prohibit Yanmar authorized dealers in Alabama from selling parts for use in Yanmar gray market tractors."

On March 23, 2012, the trial court conducted a hearing on Yanmar Japan's motion to dismiss the complaint against it for lack of in personam jurisdiction. On April 10, 2012, the trial court entered an order allowing the parties to engage in further discovery and supplemental briefing addressing Randy's amended complaint. Following consideration of the parties' briefs and arguments, the trial court, on October 5, 2012,

23

entered an order granting Yanmar Japan's motion to dismiss for lack of in personam jurisdiction.

On February 27, 2013, Randy moved to voluntarily dismiss the claims against Northside. Randy entered into a pro tanto settlement with Artec to settle the claims against it for $550,000. On April 8, 2013, Randy moved the trial court to dismiss Artec because of the pro tanto settlement the parties had reached. On April 10, 2013, the trial court entered an order granting Randy's motion for a pro tanto dismissal of the claims against Artec. On April 29, 2013, the trial court entered an order granting Randy's motion to voluntarily dismiss Northside, leaving only Yanmar America as a defendant. On March 18, 2013, Yanmar America moved the trial court for a summary judgment arguing, among other things, that it was entitled to a summary judgment on the claim that it negligently failed to warn Artec that Yanmar gray-market tractors did not meet United States safety standards. On April 24, 2013, the trial court entered an order denying Yanmar America's motion for a summary judgment.

The case proceeded to trial against Yanmar America on April 29, 2013. At the close of Randy's evidence, Yanmar

1130214

America moved the trial court for a preverdict judgment as a matter of law ("JML"), which the trial court denied.  Yanmar America renewed its motion for a preverdict JML at the close of all the evidence, which the trial court also denied. On May 3, 2013, the jury returned a verdict in favor of Randy and against Yanmar America awarding Randy $900,000 in damages. The trial court reduced the damages award by the amount of the $550,000 pro tanto settlement with Artec and entered a judgment of $350,000 in favor of Randy.

On May 31, 2013, Yanmar America moved the trial court for a postverdict JML or, in the alternative, for a new trial.  On August 14, 2013, the parties filed a joint motion consenting to extend the time for the trial court's consideration and ruling on Yanmar America's postverdict motion.  Following a hearing, the trial court, on October 15, 2013, entered an order denying Yanmar America's postverdict motion. Yanmar America timely appeals.

<u>Standard of Review</u>

The standard of review for a ruling on a motion for a JML is as follows:

> "'When reviewing a ruling on a motion
> for a JML, this Court uses the same

25

standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So. 2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So. 2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So. 2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So. 2d 1126 (Ala. 1992).'

"Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1152 (Ala. 2003)."

CSX Transp., Inc. v. Miller, 46 So. 3d 434, 450-51 (Ala. 2010).

## Discussion

Although Randy asserted various theories of recovery against Yanmar America, the case was tried on a theory that Yanmar America voluntarily assumed a duty to warn Randy of the safety issues relative to operating a Yanmar gray-market tractor by voluntarily undertaking activities to warn Yanmar dealers, as well as the owners and potential purchasers of Yanmar gray-market tractors, of the safety issues associated with operating the Yanmar gray-market tractors and that Yanmar America then negligently performed that duty to warn.

### I. Voluntary Assumption of the Duty to Warn

Initially, we note that Yanmar America was not the supplier or manufacturer of the Yanmar gray-market tractor involved in this case; therefore, it initially owed no duty to warn the expected users of the gray-market tractor of the safety issues relative to its use. See Ex parte Chevron Chem. Co., 720 So. 2d 922 (Ala. 1998). However, "[i]t is well settled under Alabama law that one who undertakes to perform a duty he is not otherwise required to perform is thereafter charged with the duty of acting with due care." King v. National Spa & Pool Inst., Inc., 570 So. 2d 612, 614 (Ala. 1990). See also United States Fid. & Guar. Co. v. Jones, 356

27

1130214

So. 2d 596, 598 (Ala. 1977)("The law, simply stated, is that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care."), and Fireman's Fund American Ins. Co. v. Coleman, 394 So. 2d 334, 349 (Ala. 1980) (Jones, J., concurring in the result and stating that "[t]he rule is well established that common law liability to third parties can arise from the negligent performance of even a voluntary undertaking").

The trial court concluded as a matter of law that Yanmar America voluntarily undertook a duty to warn Randy of the safety concerns associated with the use of a Yanmar gray-market tractor. Yanmar America acknowledged at trial that it voluntarily undertook a duty to warn; however, it did not believe that that duty to warn extended to Randy. Yanmar America argues on appeal that, by issuing the safety notices and undertaking activities such as the parts-blocking program in order to impede the sale of gray-market tractors, it did not voluntarily assume a duty to warn "every potential user" of the dangers associated with the use of a gray-market tractor.

28

1130214

The evidence indicates that Yanmar America became concerned that Yanmar equipment dealers selling gray-market tractors, owners of gray-market tractors, and potential purchasers of gray-market tractors were not aware of the important differences between the gray-market tractors and those Yanmar tractors manufactured and intended for distribution in the United States. Pott stated that the need for warnings arose out of the way the gray market had developed in the United States, as well as Yanmar Japan's decision to support the gray-market tractors with genuine Yanmar parts during a period in the 1990s, which, he stated, created confusion as to whether there were significant differences between the gray-market tractors and those Yanmar tractors intended for use in the United States. Thus, Yanmar America began disseminating safety notices for the purpose of warning Yanmar dealers, owners of gray-market tractors, and potential purchasers of gray-market tractors of the safety concerns associated with operating a Yanmar gray-market tractor. This campaign to warn Yanmar dealers, owners of gray-market tractors, and potential purchasers culminated in 2008 with a mass mailing to all authorized dealers of Yanmar parts

and service and construction and industrial equipment. Artec, the importer and party responsible for putting the gray-market tractor at issue into the stream of commerce, was an authorized equipment dealer of Yanmar America at the time. Pott testified that the purpose of the safety notices was to prevent injury and death to the owners and potential purchasers of the Yanmar gray-market tractors.

In addition to issuing safety warnings regarding the gray-market tractors, Yanmar America engaged in other activities, such as the parts-blocking program, in order to impede the sale of the gray-market tractors. Thus, it is clear from the record, as well as from Yanmar America's own acknowledgment at trial, that it voluntarily assumed a duty to warn of the safety hazards associated with operating a Yanmar gray-market tractor.

As for whether the duty to warn undertaken by Yanmar America extends to Randy,[7] we note that "'[t]he ultimate test of duty to use [due] care is found in the foreseeability that

---

[7]We reiterate that Yanmar America conceded on the record that it indeed had assumed a duty to warn. Pott testified that the warnings were intended for owners and potential purchasers of the gray-market tractors and that the purpose of the warnings was to prevent injury and/or death.

harm may result if care is not exercised.'" King, 570 So. 2d at 615 (quoting Bush v. Alabama Power Co., 457 So. 2d 350, 353 (Ala. 1984)). As discussed above, Yanmar America undertook a duty to issue safety warnings to owners and potential purchasers of Yanmar gray-market tractors in order to prevent injury and death resulting from the operation of those tractors. Therefore, the duty to warn that Yanmar America voluntarily undertook would apply to foreseeable owners or operators of the gray-market tractor Autrey purchased. Obviously, it was foreseeable to Yanmar America that Autrey, as an owner of a Yanmar gray-market tractor, needed to be warned of the safety hazards associated with the operation of a gray-market tractor or risk Autrey's being injured or killed while operating the tractor. Moreover, it was just as foreseeable that someone other than Autrey -- in this case Randy -- might operate the tractor and would also be in need of a warning via Autrey regarding the hazards associated with operating the tractor. Thus, we conclude that the duty to warn of potential hazards associated with operating the gray-market tractor extended to Randy and that the trial court did

not err as a matter of law in extending the duty to warn to him.

## II. Breach of the Duty to Warn

Randy claims that Yanmar America breached its voluntarily undertaken duty to warn because: (1) Yanmar America's warnings were insufficient to warn of the safety hazard that actually caused the gray-market tractor to overturn, which was the propensity of the tractor to roll over under certain conditions because of its relative instability owing to its narrow wheel spacing and weight configuration or distribution, coupled with tires with higher tread patterns that raised the center of gravity of the tractor, and (2) because Yanmar America had failed to ensure that the safety warnings were disseminated in such a manner that they would actually reach the potential purchasers and users of the Yanmar gray-market tractors.

As this Court noted in Beasley v. MacDonald Engineering Co., 287 Ala. 189, 249 So. 2d 844 (1971),[8] liability for the breach of a duty voluntarily undertaken is governed by Restatement (Second) of Torts § 324A (1965), which states:

---

[8]We have not been asked to overrule caselaw adopting Restatement (Second) of Torts § 324A (1965).

"'Liability to third person for negligent performance of undertaking. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"'(a) his failure to exercise reasonable care increases the risk of such harm, or

"'(b) he has undertaken to perform a duty owed by the other to the third person, or

"'(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.'"

287 Ala. at 193, 249 So. 2d at 487 (quoting Restatement (Second) of Torts § 324A). See also Commercial Union Ins. Co. v. DeShazo, 845 So. 2d 766 (Ala. 2002). In accordance with § 324A(a), the trial court instructed the jury that Yanmar America could be held liable for negligently failing to warn Randy based on its voluntarily assuming a duty to warn only if "Yanmar America's negligence increased the risk of harm to Randy."

Yanmar America argues on appeal that it did nothing to increase the risk of harm to Randy by issuing the safety

33

notices in this case and by undertaking other activities to impede the importation, sale, and use of the gray-market tractors in the United States. "Section 324A(a) applies only to the extent that the alleged negligence of the defendant 'exposes the injured person to a greater risk of harm than had existed previously.'" Herrington v. Gaulden, 294 Ga. 285, 288, 751 S.E.2d 813, 816 (2013) (quoting Taylor v. AmericasMart Real Estate, 287 Ga. App. 555, 559, 651 S.E.2d 754, 758 (2007)). Moreover, the "test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." Myers v. United States, 17 F.3d 890, 903 (6th Cir. 1994). Liability can be imposed on one who voluntarily undertook the duty to act only where the actor "affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm" to the plaintiff. Id. See also Patentas v. United States, 687 F.2d 707, 717 (3d Cir. 1982) ("[T]he comment [c] to section 324A makes clear that

34

'increased risk' means some physical change to the environment or some other material alteration of the circumstances.").

As mentioned above, Randy claims in part that Yanmar America breached the duty to warn that it had voluntarily undertaken by issuing insufficient safety warnings that failed to warn of the safety hazards that actually caused the tractor he was operating to roll over. The evidence is undisputed that those safety warnings never reached Artec or Randy. Because neither Artec nor Randy ever saw the safety warnings, Yanmar America's failure to include more specific information regarding the hazards of operating a Yanmar gray-market tractor could not possibly have increased the risk to Randy over the risk that already existed in the absence of a notice. See McMellon v. United States, 338 F.3d 287, 295 n.5 (4th Cir. 2003) (observing that "[t]he plaintiffs do not contend, nor could they, that the government, by posting signs that the plaintiffs did not see, increased the risk to the plaintiffs over that which they would have faced had no signs been posted"), vacated and remanded on other grounds, 387 F.3d 329 (4th Cir. 2004).

Randy also bases his argument that Yanmar America breached the duty to warn on his claim that Yanmar America had failed to ensure that the safety warnings were disseminated in a manner by which they would actually reach the potential purchasers and users of the Yanmar gray-market tractors. He points to the testimony of Trimm and Randy in support of this contention. Trimm testified that if he had been warned that the Yanmar gray-market tractor was not designed for, and not safe to operate in, the United States, he would have "passed the information on" to Northside and would have offered to purchase the tractor back from Northside. Randy testified that had he known of the stability issues associated with the Yanmar gray-market tractor he would not have used it. Randy argues that Yanmar America's negligence in failing to ensure that the safety warnings were disseminated to Randy increased his risk of harm. We disagree.

Yanmar America conceded that it undertook a duty to warn owners and potential purchasers of the safety hazards associated with the operation of a Yanmar gray-market tractor in the United States. Yanmar America issued safety warnings and also undertook other activities to impede the importation

and sale of gray-market tractors in the United States, the importations and gray-market sales being circumstances beyond its control. Although it is undisputed that those safety warnings never reached Randy, the result is the same as if Yanmar America had elected not to undertake any such activities to warn the foreseeable users of the Yanmar gray-market tractors. By issuing the safety warnings and failing to ensure that they were disseminated to Randy, Yanmar America exposed Randy to no greater a risk of harm than he would have been exposed to previously had Yanmar America chosen not to act in order to warn the potential users of the gray-market tractors. Herrington, supra.

We conclude that Randy failed to establish by substantial evidence that Yanmar America participated in an activity that increased his risk of harm over any risk of harm that would have existed had Yanmar America chosen not to warn potential users of the gray-market tractors in this case. Accordingly, the trial court erred as a matter of law in denying Yanmar America's motions for a JML on Randy's failure-to-warn claim.

## Conclusion

1130214

We reverse the judgment of the trial court and remand the case for the trial court to enter a judgment consistent with this opinion.

REVERSED AND REMANDED.

Stuart, Wise, and Bryan, JJ., concur.

Parker, J., concurs specially.

Murdock and Main, JJ., concur in the result.

Moore, C.J., recuses himself.

1130214

PARKER, Justice (concurring specially).

I am not yet convinced that the "increases the risk of such harm" standard set forth in Restatement (Second) of Torts § 324A(a) (1965) and applied by the majority in this case applies to any and all voluntary-warning situations.

1130214

MURDOCK, Justice (concurring in the result).

I agree that nothing in the warnings posted by Yanmar America Corporation or in the physical notices mailed by it to dealers increased the risk of harm to anyone who might have seen or received the same, much less someone in Autrey Nichols's or Randy Nichols's position. As a threshold matter, however, I question whether Yanmar America conceded that it understood a duty to warn any person (including Autrey and Randy) who did not happen upon its Web site postings or actually receive one of its mailings, and I am not persuaded that the evidence presented, including the testimony of Ryan Pott, supports a contrary conclusion. I therefore concur in the result.